# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A dark grey iPhone in a multi-colored case, hereinafter identified as the "Target Telephone"

Case No.24-855M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 6/18/2024 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 12/01/2024.

Date and time issued: 6/4/2024 @1:01 p.m.

[signature] Nancy Joseph
*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________________________
*Executing officer's signature*

____________________________________
*Printed name and title*

## ATTACHMENT A

The property to be searched is described as a dark grey iPhone in a multi-colored case, hereinafter identified as the "**Target Telephone**."

The **Target Telephone** is currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes the forensic examination of the **Target Telephone** for the purpose of identifying the electronically stored information described in Attachment B.

<u>**ATTACHMENT B**</u>

1. All records on the **Target Telephone** described in Attachment A that relate to violation of Title 21, United States Code, §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and involve Aurion OXLEY since January 2020, including, but not limited to:

a. lists of customers and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. Photographs and/or videos depicting possession of drugs;

g. Any evidence related to either the ownership, purchase, or possession of drugs;

h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **Target Telephone**;

2. Evidence of user attribution showing who used or owned the **Target Telephone** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

A dark grey iPhone in a multi-colored case, hereinafter identified as the "Target Telephone"

Case No.24-855M(NJ)

Matter No. 2023R00283

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution and possession with the intent to distribute controlled substances; and Conspiracy to distribute and possess with the intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of 180 days *(give exact ending date if more than 30 days:* 12/01/2024 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KOSTANDEAN KAZAMIAS Digitally signed by KOSTANDEAN KAZAMIAS Date: 2024.06.03 16:12:36 -05'00'

*Applicant's signature*

Kostandean P. Kazamias, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 6/4/2024

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kostandean P. Kazamias, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since 2020. I am currently assigned to the Milwaukee District Office, Group 63. My duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. §§ 1956 and 1957. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, and Section 2516.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I

have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4. I have aided and participated in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other case agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who

have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is described as a dark grey iPhone in a multi-colored case, hereinafter identified as the "**Target Telephone**."

8. The **Target Telephone** is currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

9. The applied-for warrant would authorize the forensic examination of the **Target Telephone** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10. The Drug Enforcement Administration (DEA) and the North Central High Intensity Drug Trafficking Area (HIDTA) are currently investigating the drug trafficking activities of a multi-state Drug Trafficking Organization (DTO). During the course of the investigation case agents have identified multiple individuals involved in supplying multi-kilogram quantities of narcotics to Milwaukee, Wisconsin, and other areas. Evidence gathered during the course of this investigation reflects that Cornel C. CARNEGIE and Marcel D. OXLEY SR. are responsible for, and coordinating the movement of, multi-kilogram quantities of narcotics from California. The evidence further reflects that Aurion M. OXLEY, Tamara D. MONTGOMERY, Marcel D. OXLEY JR., Vincent L. NICHOLSON JR., and others work with OXLEY SR. and CARNEGIE to facilitate the movement of narcotics to, and store narcotics at, various stash locations in

Milwaukee, Wisconsin. Case agents have discovered that at least some of the narcotics are transported via commercial airlines from California to Chicago, Illinois, and then to Milwaukee, Wisconsin. The narcotics are then supplied to multiple individuals in the Milwaukee area, to include Anthony T. WILKS, who distributes the narcotics from the restaurant and bar he operates known as Jack's Executive Bistro, located at 4923 W. Villard Avenue, Milwaukee, Wisconsin.

**DTO Transports DTO Proceeds and Drugs via Commercial Airlines and OXLEY SR., NICHOLSON, and others Supply WILKS at Jack's Bistro**

11. Beginning around June 2023, SOI #1 began providing information to case agents. SOI #1 told case agents that various members in the DTO are smuggling kilogram quantities of various types of controlled substances, including fentanyl, crystal methamphetamine, heroin, and cocaine, on commercial airlines from California to Chicago O'Hare International Airport (ORD) by paying TSA agents to get the narcotics through airport security. More specifically, according to SOI #1, DTO members give the narcotics to TSA agents outside of the airport, typically in a black Swiss Gear backpack, and the TSA agents then bring the narcotics in the black Swiss Gear backpack through security. The TSA agents then give the backpack containing the narcotics to a different member in the DTO who is scheduled to take the flight and who has already gotten through airport security. Once the narcotics arrive in Chicago, SOI #1 stated that a courier transports the narcotics to Milwaukee, Wisconsin, typically in an Uber. According to SOI #1, the DTO facilitates weekly narcotics trips from California to ORD, and the DTO keeps TSA agents on "payroll" for the DTO.

12. SOI #1 further stated that, in much the same fashion, the DTO uses commercial airlines from ORD to California to facilitate the movement of drug proceeds in the form of bulk cash U.S. currency. SOI #1 stated that in 2022, on various occasions, SOI #1 went to ORD with a black Swiss Gear backpack containing drug proceeds. SOI #1 stated that SOI #1 has gone to ORD with Tamera MONTGOMERY, Marcel OXLEY SR., Marcel OXLEY JR. (OXLEY SR.'s son), Aurion OXLEY (OXLEY SR.'s daughter), and Vincent NICHOLSON JR. (NICHOLSON). SOI #1 stated that when SOI #1 arrived at ORD, a TSA employee met SOI #1 and SOI #1's associates at the vehicle they arrived in and took the black Swiss Gear backpack containing the drug proceeds. The TSA employee took the backpack containing drug proceeds through security and gave it to another DTO member who subsequently transported it to California. Additionally, SOI #1 stated that the TSA employee would receive a few thousand U.S. dollars as payment for transferring the backpack containing the drug proceeds to the airline passenger involved with the DTO.

13. Law enforcement records reflect that bulk U.S. currency was seized from various DTO members at an airport in 2018. More specifically, on May 18, 2018, at the Cincinnati/Northern Kentucky International Airport in the B Concourse, case agents from DEA Cincinnati RO and the Cincinnati/Northern Kentucky Airport Police Department reviewed flight manifests and discovered suspicious flight itineraries for OXLEY SR., Aurion OXLEY, and Rosie ANDERSON. Case agents engaged in a consensual encounter with these three individuals and stated they were looking for weapons, narcotics, or large sums of money travelling though the airport. Case agents

asked OXLEY SR., Aurion OXLEY, and ANDERSON if officers could search their luggage, and all three individuals consented to the search. During the search of OXLEY SR., Aurion OXLEY, and ANDERSON, case agents located U.S. currency in a large white envelope on each of them. Case agents seized approximately $27,469 U.S. dollars in total from OXLEY SR. ($7,715), Aurion OXLEY ($8,814), and ANDERSON ($10,940).

14. SOI #1 stated that SOI #1 has been to Jack's Executive Bistro approximately four times in the past to facilitate the distribution of multi-kilogram quantities of cocaine and to pick up illicit drug proceeds. Case agents displayed a Wisconsin Department of Transportation photo of Anthony T. WILKS to SOI #1, and SOI #1 positively identified the individual depicted in this photograph as "ANT," who is the owner of Jack's Executive Bistro. Specifically, SOI #1 stated that in October 2022, SOI #1 went to Jack's Executive Bistro approximately four times with NICHOLSON, at which time NICHOLSON brought approximately two to three kilograms of cocaine into the bar each time. SOI #1 stated SOI #1 remained in the car while NICHOLSON went inside on each time except for the first delivery when SOI #1 went into the bar. Furthermore, SOI # 1 stated that SOI #1 went back to Jack's Executive Bistro a few days after the first two cocaine deliveries with NICHOLSON and/or NICHOLSON and OXLEY SR. to pick up the drug proceeds.

15. Beginning in June of 2023, SOI #1 made statements against SOI #1's penal interest. The information provided by SOI #1 is consistent with evidence gathered during the course of this investigation where SOI #1 was not used, and much of SOI #1's information has been corroborated through independent investigation, including law

enforcement records, toll records, and surveillance. SOI #1's criminal history includes convictions for felon in possession of a firearm, bail jumping felony, possess with intent to distribute THC, and possess with intent to distribute THC. SOI #1 is cooperating in exchange for consideration related to SOI #1's involvement in narcotics trafficking (charges not currently pending). Finally, SOI #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein, unless otherwise noted. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #1 is credible and SOI #1's information reliable.

**WILKS Distributes Narcotics from Jack's Executive Bistro**

16. On or about February 28, 2023, case agents met with a confidential source (CS), who informed case agents that the CS knew of an individual who goes by "ANT," later identified as Anthony T. WILKS, who distributes multi-kilogram quantities of cocaine, fentanyl, and marijuana in the Milwaukee, Wisconsin area. The CS stated that WILKS is a member of the "BGM," "Bosses Get Money." The CS stated that WILKS is known to store and distribute multi-kilogram quantities of cocaine, fentanyl, and marijuana at Jack's Executive Bistro. The CS further stated that the CS has purchased approximately two kilograms of cocaine approximately three to four times from WILKS in the spring/summer of 2022 and paid approximately $23,000 per one kilogram of cocaine.

17. Beginning in January of 2023, the CS made statements against the CS's penal interest. The information provided by the CS is consistent with evidence gathered

during the course of this investigation where the CS was not used, and much of the CS's information has been corroborated through independent investigation, including law enforcement records and toll records, as well as a controlled purchase of controlled substances. The CS is cooperating for consideration relating to law enforcement activity that exposes the CS to drug trafficking charges and firearm charges, which charges have not yet been filed or presented to a grand jury. The CS's criminal history includes convictions for conspiracy to possess with intent to distribute and to distribute cocaine, battery, resisting or obstructing an officer (3 counts), keeping a drug house, disorderly conduct, possession of marijuana (2nd offense), and escape. The CS also has juvenile convictions. Finally, the CS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe the CS is credible and the CS's information reliable.

18. Throughout the course of the investigation, case agents have conducted a controlled buy. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from the target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The

informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.

19. On or about August 23, 2023, at the direction of case agents, the CS went to Jack's Executive Bistro to negotiate the purchase of approximately one-half of a kilogram of cocaine from WILKS. Case agents observed the CS, over electronic surveillance, having a conversation with WILKS outside Jack's Executive Bistro in the parking lot. The CS stated that the CS successfully negotiated the purchase of approximately half a kilogram of cocaine for $10,000 U.S. currency for the following day, August 24, 2023.

20. On or about August 24, 2023, under the direction and control of case agents, the CS arrived at Jack's Executive Bistro and purchased approximately 535 gross grams of cocaine for $10,000 U.S. currency from WILKS. The controlled buy occurred in a separate room inside Jack's Executive Bistro. After obtaining the cocaine from WILKS, which was located inside of a white Styrofoam container in a black bag, the CS gave the cocaine to case agents.

**Aurion OXLEY Used the Target Telephone to Communicate with Co-Conspirators and to Smuggle Narcotics into a Local California Jail**

21. Since January 2024, law enforcement monitored telephone calls of an inmate at the Los Angeles County Sheriff's Department Men's Central Jail, Anthony MCLEGGAN. MCLEGGAN was suspected of asking numerous different women to assist him in smuggling narcotics into the jail, via dropping them off at the Los Angeles

County Medical Center, 2010 Zonal Avenue, Los Angeles, CA. These phone calls are recorded and require the consent of both the calling party and the receiving party before the call can be completed. Both parties are made aware by a pre-recorded message that phone calls are being recorded throughout their conversation.

22. Law enforcement discovered that MCLEGGAN was making calls to a female who was using phone number (424) 467-5897 (**Target Telephone**), who was later identified as Aurion M. OXLEY. MCLEGGAN and Aurion M. OXLEY were actively coordinating a narcotics drop at the Los Angeles County Medical Center for the morning of April 8, 2024.

23. Below is a synopsis of the individual phone calls monitored by Deputy Ramos that occurred between MCLEGGAN and Aurion M. OXLEY between April 3, 2024 and May 2, 2024.

24. The information described for these phone calls is intended to be a brief synopsis of MCLEGGAN's and Aurion M. OXLEY's phone calls regarding the trafficking and payment of illegal narcotics. The following conversations are not a verbatim recitation of the phone calls.

25. On April 3, 2024, at 3:25 p.m. (PST), MCLEGGAN used inmate Arthur Grajeda's' pin and called Aurion M. OXLEY at the **Target Telephone**. Aurion M. OXLEY told MCLEGGAN she had just arrived at the hospital. He asked if she could see the building with the letter B and Aurion M. OXLEY said she could and that she had just walked inside. MCLEGGAN gave Aurion M. OXLEY specific instructions on where to go. He told her to go through the metal detectors, make a left at the hallway, pass the

elevator, and enter through the double doors. Aurion M. OXLEY stated she went through the double doors and passed the restrooms. MCLEGGAN told Aurion M. OXLEY that there would be two bathrooms on her left-hand side and instructed her to go inside the second bathroom. Aurion M. OXLEY stated she was inside the second bathroom, MCLEGGAN told her, "When it's go time" to throw everything inside the trash can. MCLEGGAN told Aurion M. OXLEY that he would "line her two bands off the triple" (two bands is slang for two thousand dollars) and that he might have some more for her. MCLEGGAN continued to tell Aurion M. OXLEY it might happen on Friday (April 5, 2024) in the morning at 6:00 a.m. He said if he calls her at eight, that's what she is going to have to do and she will have to meet up with someone so she can pick up the "demonstrations," which case agents believe was coded language for narcotics/contraband.

26. On April 7, 2024, at 3:30 p.m. (PST), MCLEGGAN used his assigned pin number and called Aurion M. OXLEY at the **Target Telephone**. MCLEGGAN told Aurion M. OXLEY to meet up with his "homegirl" to pick up the "demonstrations" for tomorrow (April 8, 2024.) MCLEGGAN said he was going to have his homegirl separate the stuff because one of them is pens, which are made of metal and can't go through the metal detector. Based on their training and experience, case agents believe "pens" was a reference to vape cartridges, commonly used to smoke THC. MCLEGGAN told Aurion M. OXLEY that there were going to be two different "demonstrations" and she needed to have one inside her bag and the other one on her person. MCLEGGAN provided Aurion M. OXLEY with his sister's phone number ((310) 493-8785) so Aurion M. OXLEY

could text her the following message: "I'm on my way to pick up the demonstrations for Baby J."

27. On April 8, 2024, at 10:04 a.m. (PST), MCLEGGAN used his assigned pin number and called Aurion M. OXLEY at the **Target Telephone**. MCLEGGAN told Aurion M. OXLEY he had been calling her all morning and asked Aurion M. OXLEY what her estimated time of arrival was to arrive at the hospital. She told him that she was at the hospital at 9:00 a.m. and never received a call from him but left because she had to drop off her daughter Zakari at school. Aurion M. OXLEY said it would take her thirty minutes to return to the hospital at approximately 10:34 a.m. (PST). MCLEGGAN asked Aurion M. OXLEY if she had the "demonstrations" with her, she said "yes." Law enforcement later verified through the Department of Children and Family Services that Aurion M. OXLEY had a daughter named Zakari Oxley and that her phone number was the **Target Telephone**.

28. Based on the information provided by Deputy Ramos and the above phone calls, law enforcement obtained Aurion OXLEY's California Department of Motor Vehicles photograph and registered vehicle information, which was a 2022 Honda bearing CA license plate 8ZLB110. Law enforcement responded to the Los Angeles County Medical Center to intercept the illegal narcotics and contraband.

29. At approximately 10:50 a.m. (PST), law enforcement saw Aurion M. OXLEY exit her vehicle (2022, grey Honda license plate #8ZLB110) which she had parked directly in front of Building B of the Los Angeles County Medical Center. Law enforcement positively identified Aurion OXLEY based on a comparison to her Department of Motor

Vehicles photograph. Aurion M. OXLEY walked into the medical facility holding a large brown handbag. Law enforcement lost sight of Aurion M. OXLEY for approximately ten minutes but regained visual of her as she walked away from the geriatrics department.

30. Law enforcement entered the geriatric department and contacted medical personnel who advised that a female black adult holding a brown bag asked to use the restroom because she was pregnant and believed she might be having a miscarriage. They believed it was suspicious and were going to call security. They saw her enter the restroom and exit a few moments later. Law enforcement subsequently conducted a search of the restroom (#3P22F) and recovered two large plastic Ziplock bags from inside of the trash can. The bags contained approximately two ounces of methamphetamine, three ounces of marijuana, various tobacco products, numerous vape cartridges containing Tetrahydrocannabinol (THC), two black vape cartridge batteries, an electronic USB charging cable, and two lighters.

31. It should be noted, law enforcement continued monitoring live phone calls between MCLEGGAN and Aurion M. OXLEY while other members of law enforcement were inside the medical building (building B). At 10:56 a.m. (PST), MCLEGGAN used his assigned pin number and called Aurion M. OXLEY at the **Target Telephone**. MCLEGGAN asked Aurion M. OXLEY if she made it in there, she said yes and that she was washing her hands and drying them with the napkins. He asked her if she was followed by personnel, and she said no. Aurion M. OXLEY told MCLEGGAN she went to the restroom but didn't see anyone in wheelchairs. He told her to sit outside in the hallway by the restroom to see if anyone in a wheelchair pulled up. They discussed the

instructions to confirm she dropped the narcotics off in the correct restroom. He asked her if she saw a Mexican in a wheelchair, and Aurion M. OXLEY said no. He told her if anyone contacted her to tell them she was pregnant and did not feel well. Aurion M. OXLEY asked MCLEGGAN how he knew who was going to pick up the narcotics, and MCLEGGAN said he spoke with the "homie" and he said he left at 7:00 a.m. (PST) MCLEGGAN further stated the "homie" would be there until 12:00 p.m. or 1:00 p.m. (PST). Aurion M. OXLEY told MCLEGGAN that personnel approached her and told her they were going to call security. MCLEGGAN asked Aurion M. OXLEY if she was able to leave everything (narcotics/contraband), and she said "yes." Aurion M. OXLEY said she put everything inside the bottom of the trash can because it was empty. MCLEGGAN instructed Aurion M. OXLEY to leave and that he would update her later after he heard from the "homie."

32. Los Angeles County Jail inmates are commonly transported to the Los Angeles County Medical Center to receive outpatient treatment they cannot obtain inside the county jails. Based on numerous investigations, law enforcement is aware the medical facility is an avenue inmates use to conspire with people not in custody to smuggle illegal narcotics into jail facilities.

33. On April 15, 2024, law enforcement drove to Aurion M. OXLEY's residence, 330 W. 9th Street, San Pedro, California 90731, and observed her vehicle (2022, Honda, License #8ZBL110) parked to the rear of the location directly in front of garage space #1.

34. On May 2, 2024, at 11:50 a.m. (PST), MCLEGGAN used his assigned pin number and called Aurion M. OXLEY at the **Target Telephone**. MCLEGGAN asked

Aurion M. OXLEY if she could "fuck" with him again on Monday. Aurion M. OXLEY said she could, but that she had to take her car to the shop for some bodywork. MCLEGGAN told Aurion M. OXLEY he needed her help and would have someone pick her up. Aurion M. OXLEY stated she could do it but reiterated that she would not be mobile.

35. Based on the above phone call, coupled with the illegal narcotics recovered on April 8, 2024, it was law enforcement's belief that Aurion M. OXLEY and MCLEGGAN were conspiring to conduct another narcotics drop. A check with the Department of Motor Vehicles and Aurion M. OXLEY's California Driver's License had her residential address documented as, 330 W. 9th Street #1, San Pedro, California 90731 (updated as of April 17, 2023). A records check of the vehicle she was driving (2022, Honda, License plate #8ZLB110) revealed Suspect Aurion M. OXLEY was the registered owner with a documented address of 330 W. 9th Street #1, San Pedro, California. A records check of the Los Angeles County Sheriff's Department visitation system revealed during the application process Aurion M. OXLEY provided her residential address of 330 W. 9th Street, San Pedro California, a phone number of (323) 488-1644, email address markelaurion@yahoo.com, and her California Driver's License number (Y2640320).

36. Based on the above phone calls and the interception of illegal narcotics/contraband, law enforcement had reason to believe that Aurion M. OXLEY was directly involved in the illegal trafficking of narcotics into Los Angeles County Jails and was conspiring with inmates and others to smuggle further narcotics.

37. On May 7, 2024, the Honorable Judge Mirich, Judge of the Superior Court of California, County of Los Angeles, signed a warrant authorizing law enforcement to obtain location data for the **Target Telephone**. This warrant was served on AT&T and law enforcement began to receive data pertaining to the location of the Target Telephone.

38. On May 7, 2024, at approximately 6:42 p.m. (PST), Aurion M. OXLEY received a phone call on the **Target Telephone** from a different inmate at the Los Angeles County Jail, Quinten Holmes. Holmes asked if Aurion M. OXLEY was going home or to her mom's. Aurion M. OXLEY advised she was going home. From 11:50 p.m. through approximately 9:11 a.m. (PST) the following day, location data revealed the **Target Telephone** was in close proximity to Aurion M. OXLEY's residence, 330 W. 9th Street #1, San Pedro, CA.

39. On May 8, 2024, the Honorable Judge Mirich, Judge of the Superior Court of California, County of Los Angeles, signed a warrant authorizing law enforcement to search Oxley's residence, 330 W. 9th Street #1, San Pedro, CA.

40. Later on May 8, 2024, at approximately 9:00 p.m. (PST), law enforcement executed this search warrant at Aurion M. OXLEY's residence. During the execution of the warrant, Aurion M. OXLEY was arrested. Recovered from Aurion M. OXLEY was one Apple iPhone, the **Target Telephone**. Aurion M. OXLEY was cited and released without incident.

41. Case agents reviewed toll activity for the **Target Telephone** and discovered that the final outgoing call or text from **Target Telephone** was on May 8, 2024 at 9:14 p.m. (PST), shortly after the warrant was executed at Aurion OXLEY's residence and the

**Target Telephone** was seized. There were several hundred incoming calls to the **Target Telephone** in the following days, but they were of zero duration, leading case agents to believe they went unanswered.

42. In addition, upon receipt of the **Target Telephone**, case agents viewed the SIM card tray from inside the telephone. Imprinted on this cell phone's tray was IMEI number 359836518688829. Previous results of an administrative subpoena revealed the IMEI for the **Target Telephone** was 35983651868882.[1] Because the IMEI numbers match with respect to 14 of the 15 digits, and because outgoing calls from (424) 467-5897 ended at approximately the time the **Target Telephone** was seized, case agents believe the **Target Telephone** was seized and turned over to case agents in Milwaukee is indeed assigned telephone number (424) 467-5897.

43. A review of telephone toll analysis pertaining to the **Target Telephone**, from February 15, 2024, through May 8, 2024 (the date of the seizure of the **Target Telephone**), revealed Aurion OXLEY used the **Target Telephone** to communicate with several suspected members of the Marcel OXLEY SR. DTO. These individuals include, but are not limited to, Marcel OXLEY SR. (180 times), Marcel OXLEY JR. (94 times), Tamera MONTGOMERY (78 times), Christian FRAZIER (22 times), and Vincent NICHOLSON (11 times).

[1] The IMEI number received through subpoena is one number short of the customary 15-digits. Case agents believe this may have been due to an error.

44. The **Target Telephone** is currently in the lawful possession of the North Central HIDTA. It was seized from Aurion OXLEY incident to her arrest, and it was later sent from the Los Angeles County Sheriff's Department to HIDTA.

45. The **Target Telephone** is currently in storage at HIDTA, 11548 W. Theo Trecker Way, West Allis, WI. In my training and experience, I believe that the **Target Telephone** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Telephone** first came into the possession of case agents.

46. Based on my training and experience, I believe that there is probable cause to believe that Aurion OXLEY has engaged in narcotics trafficking. I further believe through training and experience that data can be stored on cellular phones for extended periods of time and also can be transferred to and from other cellular phone devices. Accordingly, I believe that the **Target Telephone** is likely to contain evidence of Aurion OXLEY's narcotics trafficking activities.

## TECHNICAL TERMS

47. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers

in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

48. Based on my training, experience, and research, I know that the **Target Telephone** has capabilities that allow it to serve as wireless telephones, digital cameras,

portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

49. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

50. There is probable cause to believe that things that were once stored on the **Target Telephone** may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this

evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a

dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

52. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Telephone** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

53. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION AND DELAYED NOTICE REQUEST

54. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Telephone** described in Attachment A to seek the items described in Attachment B.

55. This is part of an ongoing investigation into a multi-state DTO distributing fentanyl, cocaine, methamphetamine, and other controlled substances in the southeast

Wisconsin area. This investigation hopes to identify all of the local members, any out of state members, any out of country members, and the sources of supply of the controlled substances being brought into southeast Wisconsin. The investigation will continue until all appropriate law-enforcement investigative methods have been exhausted.

56. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the owner or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A

The property to be searched is described as a dark grey iPhone in a multi- colored case, hereinafter identified as the "**Target Telephone**."

The **Target Telephone** is currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes the forensic examination of the **Target Telephone** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **Target Telephone** described in Attachment A that relate to violation of Title 21, United States Code, §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and involve Aurion OXLEY since January 2020, including, but not limited to:

a. lists of customers and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. Photographs and/or videos depicting possession of drugs;

g. Any evidence related to either the ownership, purchase, or possession of drugs;

h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **Target Telephone**;

2. Evidence of user attribution showing who used or owned the **Target Telephone** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.